*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2063**

Matthew Steven Benson,
Relator,

vs.

Universal Truck Service LLC,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed August 24, 2015
Affirmed
Ross, Judge**

Department of Employment and Economic Development
File No. 32601386-3

Matthew Steven Benson, New Brighton, Minnesota (pro se relator)

Universal Truck Service LLC, Roseville, Minnesota (respondent employer)

Lee B. Nelson, St. Paul, Minnesota (for respondent department)

Considered and decided by Ross, Presiding Judge; Bjorkman, Judge; and Willis, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**ROSS**, Judge

Matthew Benson quit his job as a mechanic for Universal Truck Service and an unemployment law judge determined that he is ineligible for unemployment benefits. Benson challenges that decision, arguing that the judge improperly denied him a second evidentiary hearing, made deficient credibility determinations, and erroneously decided that because of his employer's requirement that he drive an unsafe vehicle was not a good reason to quit. We affirm because the unemployment law judge acted within her discretion by not holding an additional evidentiary hearing and by determining witness credibility, and because the evidence supports the finding that Benson lacked a good reason to quit.

## FACTS

Matthew Benson worked as a fulltime mechanic for Universal Truck Service, which provides repair services for diesel trucks. On a morning in April 2014, Universal's night-shift supervisor (whom the record identifies only as Jeff) ordered Benson to service a client's vehicle about 20 miles from Universal's office. Jeff told Benson to drive to the site using a particular Universal truck, which contained tools needed for the job. Benson refused. He was concerned that the truck had a cracked windshield and was missing wipers. Jeff directed Benson to drive a different truck. Benson again refused. He was concerned that this truck had a worn tire, gas residue on its fuel tank, and an expired inspection sticker. Jeff finally directed Benson to a third truck—one that lacked the necessary tools for the job—and Benson complied.

What happened next is the subject of some disagreement between Benson and Universal. According to Michael Perry, Universal's general manager, Benson told the off-site client that he lacked the necessary tools and Jeff drove the tire-worn truck to the site so Benson could use its tools. Jeff told Benson that he intended to leave that truck and drive the one that Benson had used back to Universal's office. Benson acknowledges that he did not expressly refuse to drive that swapped truck back to Universal, but he reiterated his safety concern. Jeff replied to that stated concern by telling Benson that he would send someone else to drive the tire-worn truck. Benson admits that he countered, "[N]ormally I just drive the vehicle back," to which Jeff suggested that Benson do so unless he determined that he could not drive it. According to Benson, at the end of their conversation Jeff said, "[W]ell you know you're just gonna have to drive it back."

Benson never attempted to contact Perry, the duty supervisor. But Perry learned that Benson was upset, and he tried to reach him by phone. Benson did not answer. Benson decided to drive the truck back to Universal and confront Perry. He did. After a heated exchange, Benson quit.

Benson applied to the department of employment and economic development for unemployment benefits and was approved. Universal appealed, and an unemployment law judge (ULJ) held a hearing at which she elicited the testimony just described. Benson also testified that Universal's trucks were generally in poor condition. Perry denied that assertion, but he acknowledged the worn tire. He explained that it had gone unnoticed until Benson complained about it but that Benson could have easily replaced it. The ULJ determined that Benson was ineligible for benefits because he did not quit for a good

3

reason caused by Universal. Benson requested reconsideration and a new evidentiary hearing. The ULJ refused to hold another hearing, and she affirmed her decision denying benefits.

Benson appeals by writ of certiorari.

## DECISION

Benson challenges the ULJ's benefits decision on three grounds. He first maintains that he was entitled to a second hearing where he could introduce additional evidence. He also argues that the ULJ improperly relied on Perry's incredible testimony. And he maintains that the evidence established that he had a good reason to quit caused by Universal. None of these arguments leads us to reverse.

Benson wanted a second evidentiary hearing. A ULJ must order an additional evidentiary hearing if the requesting party demonstrates that the new evidence would likely change the outcome of the decision and that either the party had good cause for not previously submitting the evidence or the new evidence would show that previously admitted evidence was likely false. Minn. Stat. § 268.105, subd. 2(c) (2014). We defer to a ULJ's decision whether to grant an additional evidentiary hearing and will reverse that decision only if the ULJ abused her discretion. *Vasseei v. Schmitty & Sons Sch. Buses Inc.*, 793 N.W.2d 747, 750 (Minn. App. 2010). Benson says the second hearing would have given him the chance to introduce photographs showing that the tire-worn truck had a "K" designation on its license plate. He maintains that this would prove the truck needed an inspection sticker, and that this in turn would prove that his safety concerns were legitimate and that Perry falsely asserted that the truck needed no sticker.

4

Benson's argument for reversal based on the allegedly improperly denied second hearing fails because the hearing would have been futile. Minn. Stat. § 268.105, subd. 2(c) (requiring an additional hearing only if the new evidence would affect the decision). The ULJ determined that Benson's new evidence would not change her decision. This determination is well supported because, whatever safety issues the second truck might have had, the ULJ found that Universal never required Benson to drive it. And undermining Benson's contention that the photos discredit Perry because they belie his testimony that the truck needed no inspection, the inspection requirement is not so absolute as Benson suggests. *Compare* Minn. Stat. § 168.013, subds. 3(a) (defining gross weight as the weight of the unloaded truck plus "the maximum load the applicant proposes to carry on it"), (3)(c) (requiring license plates to display gross weight) (2014), *with* Minn. Stat. §§ 169.011, subd. 32(a) (defining gross vehicle weight for chapter 169 as the greater of either the weight of the unloaded vehicle plus its actual load or the maximum gross weight specified by the vehicle's manufacturer), .781, subds. 1(a)(1)(i), 2 (requiring a valid inspection sticker for vehicles with a gross vehicle weight greater than 26,000 pounds) (2014). The ULJ did not abuse her discretion by not holding an additional evidentiary hearing.

Benson's credibility challenge also is not convincing. He argues that the ULJ improperly found Perry's testimony credible, citing an inconsistency. He points out particularly that Perry testified that Universal repairs its own vehicles immediately but then admitted that some of its trucks were driven despite problems. This is not the sort of inconsistency that leads us to reverse. We generally defer to a ULJ's credibility

determination so long as the ULJ states her grounds for support. Minn. Stat. § 268.105, subd. 1a(a); 2015 Minn. Laws 1st Spec. Sess. ch. 1, art. 6, § 12 (amending Minn. Stat. § 268.105, subd. 7(d) (2014)); *Icenhower v. Total Auto., Inc.*, 845 N.W.2d 849, 855 (Minn. App. 2014), *review denied* (Minn. July 15, 2014). The ULJ stated her grounds for deeming Perry's testimony more credible than Benson's. She found that Perry's testimony was more logical, plausible, certain, and coherent. And she found Benson's testimony one-sided and apparently "exaggerated, defensive, and distorted." The transcript supports the finding. We have no ground to unsettle the ULJ's credibility determination. And we add that the benefits decision can rest largely on Benson's own testimony.

We also are not persuaded to reverse based on Benson's argument that the ULJ erroneously decided that he did not quit for a good reason caused by his employer. An employee who voluntarily quits his job is not eligible for unemployment benefits unless he falls within an enumerated statutory exception. Minn. Stat. § 268.095, subd. 1 (2014). One of these exceptions covers an applicant who quits for a good reason caused by his employer. *Id.*, subd. 1(1). Among other things, a good reason to quit must be so significant that it would "compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *Id.*, subd. 3(3) (2014). Benson argues that a reasonable worker would quit rather than drive an unsafe truck, but the ULJ's decision rested on her finding that Universal never required Benson to drive the allegedly unsafe truck. Substantial evidence, including Benson's own testimony, supports the finding. According to Benson, Jeff told him that someone else would pick up the

6

truck at the end of the work day and that Benson need not drive the truck if he determined it was unsafe. And Perry's testimony, which the ULJ found more credible than Benson's, indicated that no manager ordered Benson to drive it.

**Affirmed.**